**UNITED AIRCRAFT CORPORATION, Petitioner,**

v.

**CANEL LODGE NO. 700, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, Respondent.**

Civ. A. No. 13760.

United States District Court,
D. Connecticut.

June 17, 1970.

Joseph C. Wells, Washington, D. C., Charles A. Mahan, East Hartford, Conn., for petitioner.

Mozart G. Ratner, Washington, D. C., Daniel E. Lynch, Hartford, Conn., for respondent.

### MEMORANDUM OF DECISION

CLARIE, District Judge.

The plaintiff-employer, United Aircraft Corporation, (Company) brought this equitable action to compel the arbitration of a grievance arising out of the administration of a collective bargaining contract [1] with Canel Lodge No. 700, In-

---

1. Plaintiff's Exhibit "A".

ternational Association of Machinists and Aerospace Workers, (Union). Jurisdiction of the subject matter exists pursuant to § 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C. § 185. The pleadings, affidavits and exhibits, together with counsels' oral representations to the Court disclose that there remain no factual issues to be litigated. The plaintiff-company has presented a grievance between the parties cognizable within the terms of the existing collective bargaining agreement; one which creates a contractual duty on the part of the Union to arbitrate.

## FACTS

Tobin, a Union shop steward, was suspended by the Company for one day, on December 30, 1969, as a disciplinary punishment for his alleged violation, on December 15, 1969, of Company rules, which limited employees' rights to distribute or collect Union "check off cards" during working hours.[2] Neither Tobin nor the Union filed any grievance under the terms of the labor contract arising out of the Company's action, although Article VII, §§ 1, 3(a) (1) thereof, authorized them to do so. Section 10 of said contract provides that such an employee's right to appeal his discharge or suspension is conditioned upon his filing such grievance within five (5) working days from the date of the occurrence thereof. However, in this instance, after the five days had expired and the employee's grievance remedy under the contract was foreclosed, the Union filed an unfair labor practice charge with the National Labor Relations Board (NLRB) on January 6, 1970, alleging that the Company's action violated Tobin's statutory right under §§ 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1) and (3), to be free from Company discrimination.

The plaintiff-employer asserts that the labor agreement specifically provides for a grievance procedure, which was designed to promote the settlement of disputes between the employer, the Union and the Union membership. It points specifically to Article VII, § 1, which provides:

"In the event that a difference arises between the company, the union or any employee concerning the interpretation, application or compliance with the provisions of this agreement, an earnest effort will be made to resolve such difference in accordance with the following procedure which *must* be followed." (Emphasis added).

While the contract provides for four steps in the ordinary procedure for processing individual employee grievances, it permits the Company or the Union to institute a grievance at the third step. Only where the dispute cannot be settled at the fourth step and within the list of grievances listed in Article VII, § 3 is it provided that the matter shall be submitted to arbitration.[3] It further provides that the arbitrator's decision, supported by substantial evidence, shall be final and conclusive and binding upon all employees, the Company and the Union.

As soon as the plaintiff-employer first became aware of the defendant's pending labor board charge, it promptly wrote to the Union, on January 13, 1970, requesting that the dispute concerning Tobin's suspension be placed in the grievance procedure at the third

---

2. Agreement with Lodge 700, International Association of Machinists, Article IV. (Para. 3) provides:
   "There shall be no solicitation of employees for union membership or dues conducted upon the premises of the company during working hours by the union, its representatives or by employees."

3. Article VII, Section 3 provides in part:
   "(a) The following grievances, if not settled at Step 4 of Section 1 of this Article, shall be submitted to arbitration upon the request of either party hereto filed in accordance with the provisions of this Article.
   '1. A grievance concerning the discharge or disciplinary suspension of an employee.' "

step.[4] When the Union refused to consider the matter on these terms,[5] the Company, on January 19, 1970, sought to place the matter in the grievance procedure at the fourth step.[6] The Union reiterated its position by letter dated January 26, 1970, and advised the Company that it would not consider "Tobin's suspension" at any step of the grievance procedure.[7] Thereupon, the plaintiff-employer, on January 29, 1970, requested, in writing, that the dispute be submitted to arbitration pursuant to the collective bargaining contract.[8] The Union rejected plaintiff's request on the grounds that Tobin's suspension was not a grievance for arbitration, because it did not involve the interpretation, application or compliance with the provisions of the agreement; but rather that it posed a question relating to the construction and application of a governing federal statute.[9] The plaintiff thereupon filed the present court action in an effort to compel arbitration under the collective bargaining contract.

Meanwhile, the General Counsel of the NLRB issued a complaint against the Company. The respondent moved to stay further action at the hearing before the Trial Examiner pending the outcome of this action. The Examiner reserved his ruling on the motion and testimony was taken on a provisional basis. On May 15, 1970, he entered an order in Case No. 1–CA–6967, withholding any further action pending the outcome of this suit and included the following pertinent observation:

"(T)his dispute over one-day's suspension of an employee is now engaging the attention of a Board Trial Examiner and a federal court, and, if it takes the same course as other litigation between the same parties, this dispute will ultimately require consideration by Board members and a federal appellate court, and will consume untold man-hours of their time as well as of the time of Board staff members and of the staff of the General Counsel, in addition to the time already spent thereon. * * *

"It is true that more is involved here than one day's backpay for one man. If Respondent is ultimately found to have discriminated against Tobin, the conventional remedy would include a requirement that it post a notice promising not to discriminate against employees for Union activity. However, the Board has recently issued two decisions finding that Respondent discharged or suspended a number of employees, including union stewards, for Union activity and requiring it to post at various of its plants, including the one here involved, notices abjuring any future resort to such conduct. Petitions for review of both those cases are pending before the Court of Appeals for the Second Circuit. If the Board prevails in either of these cases, an appropriate notice will have to be posted by Respondent, which will presumably cure the coercive effect of any past discrimination, including that here involved."

"It is clear, therefore, that apart from compensating Tobin for loss of one day's pay, little, if anything, will be gained by the inordinate expenditure of money and time required to process this matter further. In view of this, it may be too much to hope that the parties, with the help of their exceptionally able counsel, will devise some formula for disposing of this matter without further litigation." (See Petitioner's Motion to Lodge).

The General Counsel thereupon appealed the Trial Examiner's ruling and represented to the Board that the Company had been recently involved in many alleged discriminatory and unfair labor practices of a similar kind and that in the light of past history the Trial Exam-

4. Plaintiff's Exhibit "B".

5. Plaintiff's Exhibit "C1".

6. Plaintiff's Exhibit "C2".

7. Plaintiff's Exhibit "C4".

8. Plaintiff's Exhibit "E".

9. Plaintiff's Exhibit "F".

iner's recommendations were unrealistic. He contended that the outcome of the Court proceeding to compel arbitration was irrelevant, because the Board would, in the circumstances of this case, assert jurisdiction with or without concurrent arbitration.

On June 3, 1970, the Board granted the General Counsel's appeal, reversed the Trial Examiner's ruling staying the proceedings and directed him to proceed forthwith with his decision on the merits of the proceeding. (See Respondent's Motion to Lodge).

## DISCUSSION

Labor arbitration law, still in its formative stages, has not dogmatically defined the areas and circumstances under which contractual arbitration directed in the bargaining agreement shall be given free reign to function. The fluid development of this phase of labor law is succinctly described in the words of Justice Harlan in his concurring opinion in Carey v. Westinghouse Corp., 375 U.S. 261, 273, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964), wherein he said:

"As is recognized by all, neither position in this case is without its difficulties. Lacking a clear-cut command in the statute itself, the choice in substance lies between a course which would altogether preclude any attempt at resolving disputes of this kind by arbitration, and one which at worst will expose those concerned to the hazard of duplicative proceedings. The undesirable consequences of the first alternative are inevitable, those of the second conjectural. As between the two, I think the Court at this early stage of experience in this area rightly chooses the latter."

Not every controversy arising out of a collective bargaining contract can be validly described as a statutory unfair labor practice. However, occasions often do develop where the questioned conduct giving rise to the dispute takes on a dual aspect. This ordinarily occurs when the challenged acts creating the dispute are so intertwined with statutory and contractual controls as to cause them to become almost indistinguishable in their origin. Thus, where a claim may not be factually sustainable under strict contractual terms, the Company's conduct may sometimes be described as a pretext to an overall continuing program of discriminatory unfair labor practices. The Court must fashion a workable procedure, which will not only encourage respect for the terms of the labor contract by enforcing promptly executed arbitration procedures, but at the same time it must be sensitive to carrying out the protective purposes of the federal statutory law against discrimination and unfair labor practices.

"The strong reliance upon arbitration as a means of peacefully and expeditiously resolving labor disputes, evidence in the drafting of section 301 and its interpretation by the Supreme Court, see e. g., Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 * * * might be immeasurably frustrated were it within the power of a recalcitrant party to assert that his conduct, alleged to be a breach of contract, is also an unfair labor practice and within the sole domain of the NLRB; almost any breach of a collective bargaining agreement could successfully be garbed as an unfair labor practice. * * * (A)ll of these factors are incompatible with an assertion that courts or arbitrators must necessarily be deprived of jurisdiction over disputes which in some form or other trench upon the possible, but as yet unexercised, use of power by the National Labor Relations Board." Carey v. General Electric Company, 315 F.2d 499, 509 (2 Cir. 1963).

Here the respondent Union, through its counsel, openly asserts that it intentionally waived the employee's right to use the contractual grievance procedures afforded under the labor contract, by deliberately permitting the expiration of the five-day limitation period, and then filing a formal complaint with the

NLRB. The Union stresses that since the employee, Tobin, is the only person aggrieved by the alleged unlawful suspension, no grievance exists on which the Company might assert a right to arbitration. It suggests that the only aggrievement the Company might allege is that the Union chose to exercise its statutory right to file a complaint with the Board; and, since the filing period for the employee's grievance has expired, the same contractual time for the limitation bars the Company from claiming a grievance under Article VII, § 1, step 3(b). Finally, the Union points to the transcript of the contract negotiation sessions relating to grievance procedures, to demonstrate that the parties never agreed to bargain and negotiate all employee complaints affecting working conditions [10] and at no time intended to forego its statutory rights to file charges covering any grievance within the jurisdiction of the NLRB.

It has long been recognized that the statutory right to resort to the Board for relief against unfair labor practices cannot be foreclosed by private contract.

"These decisions are based on the express language of § 10(a) of the National Labor Relations Act, 29 U.S.C. § 160 (a), which provides in part:

'The Board is empowered * * * to prevent any person from engaging in any unfair labor practice * * * affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: * * *.'

"This express statutory mandate, in turn, reflects the theory enunciated by the Supreme Court in the National Licorice Co. v. N. L. R. B.: 'The Board asserts a public right vested in it as a public body, charged in the public interest with the duty of preventing unfair labor practices.' 309 U.S. [350] at 364, 60 S.Ct. [569] at 577. This public interest in preventing unfair labor practices cannot be entirely foreclosed by a purely private arrangement, no matter how attractive the arrangement may appear to be to the individual participants." Lodge 743, Int. Ass'n of Mach. v. United Aircraft Corp., 337 F.2d 5, 8–9 (2 Cir. 1964). See Dubo Mfg. Co., 142 N.L.R.B. 431, 53 L.R.R.M. 1070.

If the Union's present approach to this dispute were tenable, it would mean that the Union in its exclusive discretion could evade, at will, the contract arbitration process by deliberately refraining from submitting the alleged grievance within the five (5) day limitation period and then filing its complaint with the Board. Such unilateral action on the part of the Union, if permissible, would totally destroy the mutuality of the substantive terms of the labor agreement on this very important and basic contractual consideration.

"Clearly employers will be wary of assuming obligations to arbitrate specifically enforceable against them when no similarily efficacious remedy is available to enforce the concommitant undertaking of the union to refrain from striking." Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (June 1, 1970).

In an analogous situation, the employee-plaintiffs alleged job discrimination pursuant to a civil rights statutory remedy, where grievances were subject to an arbitration clause in the collective bargaining contract; in that instance, the court unequivocally stated:

"The situation facing the trial court was one in which there exists concurrent jurisdiction under the statutory scheme and under the grievance and arbitration process for the resolution of claims against an employer and a union. The analogy to labor disputes involving concurrent jurisdiction of

---

10. Defendant's Exhibits "Q(1)", "Q(2)", "Q(3)", and "R".

the N.L.R.B. and the arbitration process is not merely compelling, we hold it conclusive.

"While we recognize that there is a burden placed on the defendant who must defend in two different fora, we also note that there may be crucial differences between the two processes and the remedy afforded by each. Also, as with unfair labor practice cases, in a case involving an alleged breach of a contract brought before an arbitrator, the arbitrator may consider himself bound to apply the contract and not give the types of remedy which are available under the statute. Conversely, an action in court may not be able to delve into all the ramifications of the contract nor afford some types of relief available through arbitration, * * *" Bowe v. Colgate-Palmolive Company, 416 F.2d 711, 714–715 (7 Cir. 1969). See NLRB v. Acme Industrial Co., 385 U.S. 432, 437–439, 86 S.Ct. 893, 15 L.Ed.2d 662 (1967).

The Union asserts that this is not a case where "a difference arises between the Company, the Union or any employee concerning the interpretation, application or compliance with the provisions of this agreement," controlled by Article VII, § 1 of the contract. It contends that even if arbitration were resorted to, it could not be expected to effectively dispose of the basic issues in dispute. Whether or not the time period had elapsed for the Company to assert its claim to arbitrate, or what the facts disclosed at such a hearing might reveal, are all matters properly to be decided by the named arbiters pursuant to Article VII, § 3(g) of the contract. The arbitration process will not preclude or otherwise limit the Union's right to simultaneously process its statutory grievance before the NLRB. It shall be the Board's prerogative, depending upon the facts and circumstances of the particular case, to exercise its discretion to either refrain from conducting a parallel investigation and hearing pending the arbiter's findings, or if the facts warrant, to proceed forthwith to a prompt adjudication and enforcement consistent with its statutory responsibilities.

"Proceeding with the arbitration will not disrupt or interfere with the Labor Board case. * * * So far as cost or inconvenience of producing like or similar evidence before the arbiter is concerned, no policy defined in the Labor Act affords any immunity to the parties to an arbitration agreement. * * * Actually, there are quite separate rights involving separate legal and factual issues. In the arbitration proceeding, the Union is seeking to enforce the contractual right of employees not to be discharged 'unjustly'. On the other hand, what is at issue in the Labor Board proceeding is the statutory rights of employees not to be discharged because of their union membership or because of anti-union discriminatory purposes on the employer's part." United Steelworkers of America v. American Internat'l Aluminum Corp., 334 F.2d 147, 152 (5 Cir. 1964).

The mere fact that the plaintiff-employer here suspended the employee without simultaneously filing a grievance does not preclude the latter from requesting arbitration. Article VII, § 6 of the agreement clearly defines this time limitation as affecting only the employee's right to file such a grievance and it vests in the employer the discretion to waive the time limitation for a satisfactory reason.

"(T)he court's function is limited to determining whether there is any reasonable construction of the arbitration clause that would cover the grievance on its face and whether any other provision of the contract specifically excludes it. Under the *Steelworkers* doctrine:

'Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbi-

tration provisions of the collective agreement.'

\* \* \* \* \* \*

'An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' Warrior & Gulf [United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1403], 363 U.S. at 581, 582–583, 80 S.Ct. at 1352." International U. of E., R. & M. Wkrs. v. General Electric Co., 407 F.2d 253, 256 (2 Cir. 1968).

The respondent Union represents that the case of Old Dutch Farms, Inc. v. Milk Drivers & Dairy Emp. Union, 359 F.2d 598 (2 Cir. 1966), is controlling and dispositive of the issue raised, however, the Court is not persuaded. In that case, the court distinguished between contract actions brought under § 301(a), where the subject matter has been traditionally within the province of arbitration, as compared with tort claims filed under § 303. It pointed out that the latter group requires an explicit statement directing arbitration otherwise they are peculiarly suited for judicial interpretation. See Vaca v. Sipes, 386 U.S. 171, 179, 87 S.Ct. 903, 17 L. Ed.2d 842 (1967); Twin Excavating Co. v. Local Union 731, Excavating, Etc., 337 F.2d 437 (7 Cir. 1964); Silvercup Bakers, Inc. v. Fink Baking Corp., 273 F.Supp. 159 (1967).

Tobin's conduct unquestionably created friction in the normal employer-employee relationship under the contract. If the claimed conduct violated Article IV of the collective bargaining agreement,[11] then a grievable dispute existed, which was subject to the Grievance Procedure under Article VII. When the Union filed the charges against the employer, the latter became alerted for the first time that the Union formally regarded the employer's action as unjustifiable. It is for one of the arbitrators named in the agreement to hear the facts and make his findings.

"Whether or not the Union's demands have merit will be determined by the arbitrator in light of the fully developed facts. It is sufficient for present purposes that the demands are not so plainly unreasonable that the subject matter of the dispute must be regarded as nonarbitrable because it can be seen in advance that no award to the Union could receive judicial sanction." John Wiley & Sons v. Livingston, 376 U.S. 543, 555, 84 S.Ct. 909, 917, 11 L.Ed.2d 898 (1964).

"Doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration." *Id.* at 557, 84 S.Ct. at 918.

It is a commonly accepted precept that labor-management frictions and misunderstandings should be recognized and treated early in their origin. It is then that problems are of manageable size and subject to remedial measures, with a minimal harm and scarring to the participants. Courts have thus encouraged the principals in collective bargaining agreements to create a forum of their own, wherein such disputes can promptly be resolved. The present dispute has created a grievance between the parties. Arbitration will determine whether or not the employee's conduct was justified under the terms of the contract. Arbitration will not in any manner frustrate, invade or otherwise interfere with the NLRB's action relating to the Union's charge of unfair labor practice under the statute. While the Court's recognition of contractual arbitration may provide some duplicity in this case, it will

---

11. See note 2, *supra.*

generally encourage the prompt utilization of this facility by both parties except where statutory relief is required to eliminate a course of unlawful conduct.

The Court finds that the plaintiff has presented a grievance cognizable within the terms of the labor agreement; and the Union has a contractual duty to arbitrate the same. The parties shall within five (5) days submit an appropriate order to the Court. So ordered.

The foregoing opinion shall constitute the findings of fact and conclusions of law required to be filed by the Court pursuant to Rule 52(a), Fed.R.Civ.P.